UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

HEATHER LYNN HOLSO HOWELL,

Plaintiff,

v.

KILOLO KIJAKAZI, Commissioner of Social Security,

Defendant.

Case No.:   20-cv-2517-BLM

**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND REMANDING FOR FURTHER PROCEEDINGS**

Plaintiff Heather Lynn Holso Howell brought this action for judicial review of the Social Security Commissioner's ("Defendant" or "Commissioner") denial of her claim for Social Security Disability Benefits.  ECF No. 6.  Before the Court are Plaintiff's Motion for Summary Judgment [ECF No. 17], Defendant's Opposition to Plaintiff's Motion for Summary Judgment [ECF No. 18], and Plaintiff's Reply [ECF No. 19].  After careful consideration of the pleadings and supporting documents, the Court **GRANTS** Plaintiff's Motion for Summary Judgment and **REMANDS** for further proceedings.

## PROCEDURAL BACKGROUND

On March 27, 2017, Plaintiff filed a Title II application for a period of disability and disability insurance benefits alleging disability beginning on January 1, 2016.  Administrative Record ("AR") at 457-460.  The claims were denied initially on August 17, 2017, and upon reconsideration on December 12, 2017.  Id. at 384-387; 389-394.  Plaintiff requested an

1

administrative hearing on March 2, 2018.  Id. at 394-395.

On January 14, 2020, an oral hearing was held before Administrative Law Judge ("ALJ") Randolph Schuman.  Id. at 59-81.  Plaintiff and an impartial vocational expert ("VE"), Erin Welsh, testified at the hearing.  Id.  In a written decision dated March 12, 2020, ALJ Schuman determined that Plaintiff was not disabled under the Social Security Act.  Id. at 26-47.  On April 10, 2020, Plaintiff requested review by the Appeals Council.  Id. at 453.  The Appeals Council denied review of the ALJ's ruling, and on November 20, 2020, the ALJ decision became the final decision of the Commissioner.  Id. at 1-7.

On December 29, 2020, Plaintiff filed the instant action seeking judicial review of the denial of her application for Social Security Disability Insurance Benefits for lack of disability.  ECF No. 1.

## ALJ's DECISION

At step one of the sequential review, the ALJ determined that Plaintiff had not engaged in substantial gainful activity during the relevant time period (since January 1, 2016).  AR at 41. At step two, he determined that Plaintiff "ha[d] the following severe impairments: Non-specific myalgia/myositis/arthralgia; atypical facial pain; degenerative disc disease of the spine; mild osteoarthritis of the hand; and mild neuropathy of the right median nerve (20 CFR 404.1520(c))."  Id.  At step three, the ALJ found that Plaintiff's medically determinable impairments or combination of impairments did not meet or medically equal the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525, and 404.1526).  Id.  At step four, the ALJ considered Plaintiff's severe impairments and determined that her residual functional capacity ("RFC") permitted her

> to perform light work as defined in 20 CFR 404.1567(b) except she is limited to lifting and carrying 20 pounds occasionally, and ten pounds frequently; standing and/or walking up to six hours in an eight hour workday; sitting up to six hours in an eight hour workday; occasional climbing of ramps and stairs, crawling, crouching, kneeling, and stooping; no climbing of ladders, ropes or scaffolds; frequent bilateral handling and fingering; no constant keyboarding or use of hand tools requiring torquing motion or pressure; and avoid concentrated exposure to extreme cold, loud noise, unprotected heights, and moving and dangerous machinery.

Id. at 42.  The ALJ found that Plaintiff's testimony was partially consistent with objective medical evidence, and that although Plaintiff is unable to perform past relevant work, considering her age, education, work experience, and RFC, there are jobs that exist in significant number in the national economy that she can perform.  Id. at 46.

## STANDARD OF REVIEW

Section 405(g) of the Social Security Act permits unsuccessful applicants to seek judicial review of the Commissioner's final decision.  42 U.S.C. § 405(g).  The scope of judicial review is limited in that a denial of benefits will not be disturbed if it is supported by substantial evidence and contains no legal error.  Id.; see also Miner v. Berryhill, 722 F. App'x 632, 633 (9th Cir. 2018) (We review the district court's decision de novo, disturbing the denial of benefit only if the decision "contains legal error or is not support by substantial evidence." (quoting Tommasetti v. Astrue, 522 F.3d 1035, 1038 (9th Cir. 2008)).  Substantial evidence is "more than a mere scintilla but may be less than a preponderance."  Ahearn v. Saul, 988 F.3d 1111, 1115 (9th Cir. 2011) (quoting Molina v. Astrue, 674 F.3d 1104, 1110–11 (9th Cir. 2012) (quotation marks and citation omitted), superseded by regulation on other grounds.  It is relevant evidence that a reasonable person might accept as adequate to support a conclusion after considering the entire record.  Ahearn, 988 F.3d at 1115; see also Biestek v. Berryhill, 139 S.Ct. 1148, 1154 (2019); Mar for Mar v. Saul, 838 F. App'x 290, 291 (9th Cir. 2021) (Holding that substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." (citation omitted)).  "In determining whether the Commissioner's findings are supported by substantial evidence, [the court] must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the [ALJ's] conclusion."  Laursen v. Barnhard, 127 F. App'x 311, 312 (9th Cir. 2005) (quoting Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1998)).  Where the evidence can reasonably be construed to support more than one rational interpretation, the court must uphold the ALJ's decision.  See Ahearn, 988 F.3d at 1115–16 (citing Mayes v. Massanari, 276 F.3d 453, 459 (9th Cir. 2001)).  This includes deferring to the ALJ's credibility determination and resolution of evidentiary conflicts.  See Ahearn, 988 F.3d at 1115 ("[t]he ALJ is responsible for determining credibility

resolving conflicts in medical testimony, and for resolving ambiguities," and "we reverse only if the ALJ's decision was not supported by substantial evidence in the record as a whole") (quoting <u>Andrews v. Shalala</u>, 53 F.3d 1035, 1039 (9th Cir. 1995)).

Even if the reviewing court finds that substantial evidence supports the ALJ's conclusions, the court must set aside the decision if the ALJ failed to apply the proper legal standard in weighing the evidence and reaching his or her decision. <u>See</u> <u>Miner</u>, 722 F. App'x at 633. Section 405(g) permits a court to enter judgment affirming, modifying, or reversing the Commissioner's decision. 42 U.S.C. § 405(g). The reviewing court also may remand the matter to the Social Security Administration for further proceedings. <u>Id.</u>

## DISCUSSION

### I.    Constitutionality of the Administrative Process

Initially, Plaintiff argues that the final decision of the Commissioner is invalid because it arose from an unconstitutional administrative process. ECF No. 17 at 5. In making this argument, Plaintiff relies on two recent Supreme Court cases, <u>Seila L. LLC v. Consumer Fin. Prot. Bureau</u>, 140 S.Ct. 2183 (2020), and <u>Collins v. Yellin</u>, 141 S.Ct. 1761 (2021), in which the Supreme Court found unconstitutional a statutory removal provision that limited the President's authority to remove an agency head, and an opinion form the Office of Legal Counsel. ECF No. 17 at 5-7. The parties agree that the removal provision in the Social Security Act, 42 U.S.C. 902(a)(3), is unconstitutional. ECF No. 17 at 7; ECF No. 18 at 3. Plaintiff argues that the appointment and tenure of Commissioner Andrew Saul were unconstitutional and therefore, all actions taken during his tenure are invalid. ECF No. 17 at 7-8. Because the hearing, ALJ decision, and Appeals Council review occurred during Commissioner Saul's tenure, Plaintiff claims the case must be remanded for a new hearing and administrative decision. <u>Id.</u> at 8.

Defendant disagrees and explains that in both <u>Seila Law</u> and <u>Collins</u>, the Supreme Court found the unconstitutional removal provision was severable from the remaining statute and did not invalidate all of the activities of the agency. ECF No. 18 at 9-16. Defendant argues that the ALJ's decision in this case should not be invalidated because Commissioner Saul, the presiding ALJ, and the Appeals Council were lawfully appointed, and Plaintiff cannot establish that the

unconstitutional removal provision harmed Plaintiff.  Id. at 9-20.

After the parties filed their pleadings in this case, the Ninth Circuit analyzed the unconstitutional removal provision in the Social Security Act and its effect on decisions rendered by ALJs during Commissioner Saul's tenure.  Kaufman v. Kijakazi, 32 F.4th 843 (9th Cir. 2022).  The Court held that the unconstitutional removal provision is severable from the remainder of the statute.  Id. at 848.  In reaching this decision, the Court emphasized that the removal provision "does not affect the authority of the underlying agency officials to act."  Id. at 849 (citing Collins, 141 S.Ct. at 1787–88 & n.23).  The Court noted that the claimant did not challenge the constitutionality of the appointment of any of the decision makers, including Commissioner Saul, and opined that when the appointments are valid, "there is no reason to regard any of the actions taken by the [Social Security Administration] as void."  Id. (quoting Collins, 141 S.Ct. at 1787).

The Ninth Circuit then held that "[a] party challenging an agency's past actions must [] show how the unconstitutional removal provision *actually harmed* the party—for example, if the President would have removed the agency's head but for the provision or, alternatively, if the agency's head 'might have altered his behavior in a way that would have benefited' the party."  Id. (quoting Collins, 141 S.Ct. at 1789). The Court explained that a plaintiff must "demonstrate that the unconstitutional provision actually caused [her] harm" and absent such a "showing of harm, [the Court] will refuse to unwind the decision[] below."  Id. (quoting Decker Coal Co. v. Pehringer, 8 F.4th 1123, 1137 (9th Cir. 2021).  The Court concluded that the plaintiff had "presented neither evidence nor a plausible theory to show that the removal provision caused her any harm."  Id.

Here, unlike Kaufman, Plaintiff argues that Commissioner Saul's appointment was unconstitutional[1] and therefore "[had] a direct impact on disability determinations."  ECF No. 17

---

[1] Plaintiff does not contest the constitutionality of the appointments of Nancy A. Berryhill, the ALJ, or the Appeals Council.  In fact, Plaintiff "conceded the ALJ was properly appointed by then-Acting Commissioner Berryhill."  ECF No. 19 at 4.  In light of such concession and the fact

at 7.  Plaintiff, however, fails to provide a legal basis to support her argument that Commissioner Saul's appointment was unconstitutional.  Plaintiff mistakenly asserts that "the Office of Legal Counsel conceded that [Commissioner Saul's] appointment and tenure were unconstitutional." Id.  No such concession was made.  In fact, the Office of Legal Counsel limits its opinion to the removal provision of 42 U.S.C § 902(a)(3) by concluding the provision is unenforceable but such determination does not "affect the validity of the remainder of the statute, including the default term length and succession provisions for the Commissioner."   Office of Legal Counsel, Constitutionality of the Comm'r of Soc. Sec's Tenure Prot., 2021 WL 2981542, at *10 (O.L.C. July 8, 2021).  Plaintiff also misapplies the Supreme Court's holding in Seila Law by attempting to argue the Defendant had no constitutional authority to delegate to the ALJ in light of being the "single-member head in an unconstitutional structure[.]"  ECF No. 17 at 7.  In Seila Law, the Court's opinion was limited to the President's power to remove the Director of the Consumer Financial Protection Bureau ("CFPB").  Seila L. LLC, 140 S.Ct. at 2209 ("The only constitutional defect we have identified in the CFPB's structure is the Director's insulation from removal. If the Director were removable at will by the President, the constitutional violation would disappear.").[2]

In Collins, the Supreme Court held the unconstitutional removal procedure did not render the Federal Housing Finance Agency (FHFA) Director's appointment invalid, and thus determined that the FHFA's actions under the Director were not void from the outset.  141 S.Ct. at 1787 ("Although the statute unconstitutionally limited the President's authority to remove the confirmed Directors, there was no constitutional defect in the statutorily prescribed method of appointment to that office.  As a result, there is no reason to regard any of the action taken by the FHFA [challenged on appeal] as void.").  The Court finds no difference here.  The severable removal provision does not render Commissioner Saul's appointment invalid so the Social

---

Plaintiff's case was heard and decided under Commissioner Saul, Plaintiff's argument is confined to Commissioner Saul.  See ECF No. 17 at 5-8.

[2] The Court in Seila Law merely made a distinction about for-cause restrictions of the CFPB's single-Director leadership.  The Court did not hold such structure was unconstitutional.  See Seila L. LLC, 140 S.Ct. at 2197.

Security Administration's ("SSA") decision in Plaintiff's case is not void.

The only issue remaining, therefore, is whether Plaintiff demonstrated that the unconstitutional provision actually caused her harm.  Plaintiff presents a "chain of events" that she argues shows a "strong possibility" she was "wrongfully deprived of [her] due process rights through Mr. Saul's politicization and undermining of disability benefits during his tenure."  ECF No. 17 at 7-8; see also ECF No. 19 at 8 (arguing that "the possible harm is significant" and "[t]here is a strong possibility that [Plaintiff] was among those who were wrongfully deprived of their due process rights through Mr. Saul's politicization and undermining of disability benefits during his tenure.").  A plaintiff "cannot meet her burden of showing actual harm with speculation alone."  Kaufman, 32 F.4th at 850.  Plaintiff fails to provide any evidence or plausible theory to show that she was actually harmed by the removal provision.  See id. at 849-50.  Plaintiff fails to provide any connection between the unconstitutional removal provision and the ALJ's decision to deny Plaintiff benefits, and the Court cannot find one in the record.  See Collins, 141 S.Ct. at 1802 (Kagan, J. concurring in part) (opining that "I doubt the mass of SSA decisions—which would not concern the President at all—would need to be undone" because "[w]hen an agency decision would not capture a President's attention, his removal authority could not make a difference.").  Absent a showing of actual harm, the Court will not reverse the SSA's decision.  See Kaufman, 32 F.4th at 849 ("[U]nless a claimant demonstrates actual harm, the unconstitutional provision has no effect on the claimant's case.").

Accordingly, the Court **DENIES** Plaintiff's motion for summary judgment on the grounds that the final decision of the Defendant arose from an unconstitutional administrative process.[3]

## II.    Whether the RFC is Supported By Substantial Evidence

Plaintiff argues that the ALJ failed to develop the record, leaving the ALJ's opinion

---

[3] As a result, the Court will not address Defendant's arguments regarding harmless error, the De Facto Officer Doctrine, and Broad Prudential Considerations.  ECF No. 18 at 9-20.  See Boger v. Kijakazi, No. 1:20-cv-00331-KDB, 2021 WL 5023141, at *3 n.4 ("the Court need not and does not reach the Commissioner's additional arguments (harmless error, De Facto Officer doctrine and Rule of necessity) in support of the constitutionality of the ALJ's ruling").

unsupported by substantial evidence.  ECF No. 17 at 9-11; ECF No. 19 at 12-13.  Specifically, Plaintiff argues that the ALJ did not have a medical opinion upon which to base his RFC, that the ALJ's RFC is based on his own interpretation of raw medical data, and that the objective and clinical findings summarized by the ALJ did not provide sufficient indication of Plaintiff's functional limitations.  ECF No. 17 at 10-11.

Defendant responds that the ALJ properly assessed Plaintiff's RFC and was not obligated to further develop the record.  ECF No. 18 at 14-18.  Defendant explains that the ALJ was under no such duty because no conflicts or ambiguities existed in the record, and argues that the record contains substantial evidence supporting the ALJ's RFC determination.  Id. at 16.  Defendant asserts Plaintiff's arguments "run[] counter to the fact that an ALJ is *required* to assess RFC based on all the record evidence, not merely by adopting the limitations one or more doctors have assessed."  Id. at 17.

A.  Relevant Medical Records

1.  Dr. Sabourin

On August 3, 2017, board-certified orthopedic surgeon, Thomas J. Sabourin, M.D., performed a consultative examination of Plaintiff.  Dr. Sabourin physically examined Plaintiff but did not review any records.  AR at 580.  His impressions included a mild to moderate chronic cervical strain and sprain; minimal chronic thoracolumbar strain and sprain; a history of rheumatoid arthritis, with minimal physical findings and no significant joint swelling; and mild left great trochanteric bursitis.  Id.  Dr. Sabourin concluded that Plaintiff had some limitation: she could lift/carry fifty pounds occasionally and twenty-five pounds frequently.  Id.  Dr. Sabourin also concluded that Plaintiff could stand, walk, and sit for six hours out of an eight-hour workday.  Id.  Push/pull limitations were equal to lift/carry, and Plaintiff could climb, stoop, kneel, and crouch frequently.  Id.  Dr. Sabourin further opined that Plaintiff had no manipulative limitations and had no need for assistive devices for ambulation.  Id.

2.  Dr. Tanaka

On August 16, 2017, State Agency Consultant and board-certified surgeon, Dr. Tanaka, reviewed Plaintiff's medical records and concluded that Plaintiff's RFC allowed her to occasionally

lift or carry fifty pounds, frequently lift or carry twenty-five pounds, and stand, walk, or sit for six hours out of an eight-hour workday.  AR at 368-369.  Dr. Tanaka concluded that Plaintiff had no push/pull limitations outside of the lift/carry limitations, but did have postural limitations and could frequently climb ramps/stairs/ladders/ropes/scaffolds, balance, stoop, kneel, crouch, and crawl.  Id. at 369.  Dr. Tanaka also found that Plaintiff had no manipulative, visual, communicative, or environmental limitations.  Id.  Dr. Tanaka concluded that the maximum sustained work capability that Plaintiff demonstrated was medium.  Id. at 370.

### 3. Dr. Mauro

On December 11, 2017, State Agency Consultant, Dr. Mauro, affirmed Dr. Tanaka's findings on reconsideration.  Id. at 372.  Dr. Mauro reached the same conclusions as Dr. Tanaka regarding plaintiff's physical RFC.  Id. at 380-382.  Neither Dr. Tanaka nor Dr. Mauro had knowledge of Plaintiff's February 23, 2018, cervical spine MRI or January 10, 2020, neurosurgical consultation.  Id. at 363-365, 375-376.

### 4. Initial Physical Therapy Consultation

On January 3, 2018, Plaintiff began physical therapy with Chase Billote, PT.  AR at 654.  Billote conducted a physical examination and concluded the results of his examination were consistent with mal-adaptive posture, instability of spine/pelvis, decrease range of motion and strength of spine and hips, shoulder impingement, and impaired gait/balance/stair/climbing/squat.  Id. at 653.  Billote outlined six functional goals for Plaintiff, which included completion of the home exercise program; proper postural self-correction; waking up less than five times with body pain; perform bending activities with minimal to no break without back pain; sitting with minimal to no pain for sixty minutes with the ability to perform sedentary activities; and reporting centralized back pain with no bilateral lower extremity radiculopathy signs or symptoms with activity of daily living.  Id.

### 5. February 2018 Imaging Studies

On February 23, 2018, Plaintiff underwent an MRI of her cervical spine and left hip.  AR at 635-636, 643-644.  Plaintiff presented with chronic pain.  Id. at 635.  The conclusions of the cervical spine MRI included C3-4 and C4-5 degenerative anterolisthesis, C5-6 and C6-7

1   degenerative retrolisthesis, mild central canal stenosis at C6-7 with no cord compression,

2   moderate to severe bilateral foraminal narrowing at C6-7 with probable impingement exiting C7

3   nerve roots bilaterally, and moderate foraminal narrowing on the left at C4-5 and on the right

4   at C5-6, with mild to moderate narrowing of the left C7-T1 neural foramen.  Id. at 636.

5        That same day, Plaintiff underwent a hip MRI for chronic hip and back pain.  Id. at 643.

6   The results of the MRI were normal, as there was no indication of fracture, significant or

7   inappropriate atrophy, nor tears or strains. Id.

8   6.   Nerve Conduction Study

9        On May 13, 2019, Plaintiff underwent a nerve conduction study after being referred for

10   chronic neck pain; low back pain that radiated to both upper and lower extremities; a history of

11   occipital neuralgia; tingling sensation in both forearms and hands; and cervical radiculopathy.

12   AR at 706.  Neurologist, Betul Gundogdu, M.D., conducted the study and concluded that it was

13   mildly abnormal demonstrating very mild focal sensory neuropathy of the right median nerve

14   (carpel tunnel syndrome).   Id.   Dr. Gundogu did not find evidence to support cervical

15   radiculopathy in the upper extremities.  Id.

16   7.   January 2020 Neurosurgical Consultation

17        On January 10, 2020, Plaintiff underwent a neurosurgical consultation with Cassie Petit,

18   PA.  AR at 785-787.  Petit conducted a physical examination of Plaintiff and reviewed Plaintiff's

19   cervical and lumbar MRIs, which Petit found to correlate with Plaintiff' symptoms.  Id. at 786.

20   Petit concluded that Plaintiff had signs and symptoms of cervical myelopathy and low back pain

21   with lumbar radiculopathy.  Id.  The MRIs showed severe central canal stenosis at C6-7 and

22   degenerative disc disease at C5-6 and C6-7.  Id.  Petit also found that Plaintiff had severe central

23   canal stenosis at L4-5 with spondylolisthesis and degenerative disc disease at L4-5 and L5-S1.

24   Id.

25        Plaintiff also had symptoms that were unrelated to her cervical and lumbar spine.  She

26   had severely limited cervical range of motion; triceps, intrinoi, and iliopsoas weakness; bilateral

27   straight leg raise; and bilateral clonus.  Id.  Petit recommended a L4-5 and L5-S1 anterior lumbar

28   interbody fusion and a L4-5 laminectomy, and she concluded that Plaintiff would likely need a

10

C5-6 and C6-7 anterior cervical discectomy and fusion.  Id.

        8.  Dr. Brodsky

      In a January 21, 2020 letter, Plaintiff's primary care physician, Mark Brodsky, M.D., indicated he had been treating Plaintiff for her severe pain secondary to lumbar radiculopathy, which inhibits her ability to walk or stand.  AR at 788.  Plaintiff was left in constant pain as a result of this condition.  Id.  Additionally, Dr. Brodsky related that Plaintiff had trigeminal and occipital neuralgia, which caused Plaintiff to have intermittent, severe facial pain and headaches.  Id.  Her cervical radiculopathy and carpal tunnel syndrome had negative impacts on Plaintiff's upper extremity strength and dexterity, and Dr. Brodsky concluded that Plaintiff was significantly physically incapacitated and could not participate in gainful employment.  Id.

      B.  Plaintiff's RFC

      The ALJ determined that Plaintiff's RFC allowed her to

> perform light work as defined in 20 CFR 404.1567(b) except she is limited to lifting and carrying 20 pounds occasionally, and ten pounds frequently; standing and/or walking up to six hours in an eight hour workday; sitting up to six hours in an eight hour workday; occasional climbing of ramps and stairs, crawling, crouching, kneeling, and stooping; no climbing of ladders, ropes, or scaffolds; frequent bilateral handling and fingering; no constant keyboarding or use of hand tools requiring torquing motion or pressure; and avoid concentrated exposure to extreme cold, loud noise, unprotected heights, and moving and dangerous machinery.

AR at 42.  In reaching this decision, the ALJ considered the relevant medical evidence and specifically discussed the medical care Plaintiff received between February 2017 and January 2020.  Id. at 43-45.  The ALJ also discussed the August 2017 opinion provided by Dr. Sabourin, who conducted an orthopedic consultative examination of Plaintiff and opined that Plaintiff "could perform medium exertional activity with frequent postural activity."  Id. at 45.  While the ALJ found Dr. Sabourin's opinion "unpersuasive," he explained that the opinion was consistent with the medical evidence available to Dr. Sabourin in 2017 but "subsequent records, including imaging studies from February 2018 (5F), and the more recent neurosurgical consultation (10F), indicate [Plaintiff's] condition has worsened, and that this residual functional capacity assessment is underrestrictive."  Id.  The ALJ also considered the state agency medical

20-cv-2517-BLM

consultants' opinions rendered in 2017, which were similar to Dr. Sabourin's, and found them "unpersuasive" in the same way and for the same reasons as Dr. Sabourin's.  Id.  The ALJ did not identify any opinions regarding Plaintiff's functional capabilities rendered after Plaintiff's 2018 imaging studies and 2020 neurosurgical consultation that guided his RFC determination.  Id. at 43-45.  Rather, it appears that the ALJ considered the raw medical data, including the 2018 imaging results and 2020 neurosurgical consult, and created a more restrictive RFC.  Id.

C.  Medical Opinion and Raw Medical Data

Plaintiff contends that the ALJ erred because he did not utilize a medical opinion to determine Plaintiff's RFC and improperly considered raw medical data.  ECF No. 17 at 10.

An RFC is the most a plaintiff can do despite their limitations and is based upon all relevant evidence in the record, including medical records, medical source statements, and symptom testimony.  See 20 C.F.R. § 404.1545(a)(1)-(3); see also Shafer v. Barnhart, 120 F. App'x 688, 698 (9th Cir. 2005); Laborin v. Berryhill, 876 F.3d 1151, 1153 (9th Cir. 2017) ("The ALJ assesses a claimant's RFC 'based on all the relevant evidence in [the] case record.'").  The responsibility for making this assessment is within the purview of the administrative law judge.  See 20 C.F.R. § 404.1546(c); see also Vertigan v. Halter, 260 F.3d 1044, 1049 (9th Cir. 2001) ("It is clear that that it is the responsibility of the ALJ, not the claimant's physician, to determine the residual functional capacity.").  Indeed, an ALJ's RFC determination need not reflect any particular provider's opinion precisely.  See Turner v. Comm'r of Soc. Sec. Admin, 613 F.3d 1217, 1222-23 (9th Cir. 2010) (where an ALJ properly incorporated a physician's observations in the RFC determination while simultaneously rejecting the implications regarding Plaintiff's inability to perform certain tasks).  Still, an ALJ cannot make medical judgments, only legal judgments.  Duarte v. Saul, No. 2:19-cv-01019 AC, 2020 WL 5257597, at *5 (E.D. Cal. Sept. 3, 2020) (citing Day v. Weinberger, 522 F.2d 1154, 1156 (9th Cir. 1975).  Barring a few exceptions, an ALJ must have a doctor's opinion of a claimant's functional capacity in order for there to be substantial evidence supporting the decisions."  Duarte, 2020 WL 5257597, at *5 (citing Manso-Pizarro v. Sec'y of Health & Human Servs., 76 F.3d 15, 17 (1st Cir. 1996) ("With exceptions, . . . an ALJ, as a layperson, is not qualified to interpret raw data in a medical record.")).

In formulating an RFC, an ALJ cannot interpret raw medical data.  See Day, 522 F.2d at 1156 (the ALJ was not qualified as a medical expert and therefore could not permissibly go outside the record to consult medical textbooks for the purpose of making his own assessment of the claimant's physical condition); Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir.1999) ("As a lay person, ..., the ALJ was simply not qualified to interpret raw medical data in functional terms and no medical opinion supported the determination."); Manso–Pizarro, 76 F.3d at 17; Rohan v. Chater, 98 F.3d 966, 970 (7th Cir.1996) ("ALJs must not succumb to the temptation to play doctor and make their own independent medical findings.").  Courts have considered MRIs, radiological studies, and X-rays to be raw medical data.  See Mack v. Saul, No. 1:18-CV-01287-DAD-BAM, 2020 WL 2731032, at *2 (E.D. Cal. May 26, 2020) (duty to develop where the ALJ improperly determined RFC after considering MRIs and radiological studies absent a doctor's opinion regarding the effect on plaintiff's ability to work on a function-by-function basis); see also Escudero v. Comm'r of Soc. Sec., No. 1:18-CV-01136-EPG, 2019 WL 4917634, *2 (E.D. Cal. Oct. 4, 2019) (RFC not based on substantial evidence where the ALJ considered x-rays and records indicating Plaintiff's diabetes diagnoses post-dated the accepted physician's opinion on which the ALJ based the RFC).  Such records generally reflect only the findings, impressions, and medical diagnoses, which are difficult for a lay person to interpret.  See Escudero, 2019 WL 4917634, at *2 (finding "descriptions of medical documents post-dating the physician's opinions appear to be very medical in nature and not susceptible to a lay understanding.").

Here, the record was inadequate to support the ALJ's RFC determination.  The ALJ identified three medical opinions that were rendered in 2017 that provided a function-by-function analysis of Plaintiff's capabilities.  AR at 361-383, 576-581.  However, the ALJ found these opinions unpersuasive because they pre-date material medical treatment and tests—the 2018 imaging studies and 2020 neurosurgical consultation—which establish Plaintiff's "condition ha[d] worsened" and that the 2017 opinions were "underrestrictive."  AR at 45.  While the ALJ discussed the medical records from 2018 through 2020, his discussion of the records, and the records themselves, merely provide possible diagnoses, test results, and recommended

1    treatment; the records do not describe any functional limitations.[4]  AR at 44-45.  Because the

2    later records do not include a medical opinion regarding Plaintiff's capabilities or an analysis of

3    Plaintiff's function-by-function capabilities, the ALJ apparently interpreted the raw medical data

4    himself.    The ALJ independently evaluated Plaintiff's functional capabilities and improperly

5    substituted his judgment for that of a medical expert.  See Stevenson v. Colvin, 2:15-cv-0643

6    CKD, 2015 WL 6502198, at *4 (E.D. Cal. Oct. 27, 2015) (citing Manso-Pizarro, 76 F.3d at 17)

7    (finding the ALJ improperly interpreted raw medical data when the treatment records only

8    included impressions and diagnoses without any opinion on the impairments effect on Plaintiff's

9    ability to work); Nguyen, 172 F.3d at 35 (reversing and remanding for further proceedings where

10   the ALJ made an RFC determination that was based on his own interpretation of raw medical

11   data not supported by medical opinion evidence).

12          Defendant argues that the requirement that an RFC be based on a medical opinion "runs

13   counter to the fact that an ALJ is *required* to assess RFC based on all the record evidence, not

14   merely by adopting the limitations one or more doctors have assessed."  ECF No. 18 at 17.

15   According to Defendant, an ALJ "has an obligation to consider the evidence, determine how

16   consistent the medial opinions are with that evidence, and assess the RFC accordingly."  Id.

17   While true, here, the records consist of raw medical data—medical impressions, diagnoses, and

18   descriptions of Plaintiff's impairments that were obtained from imaging records of Plaintiff's

19   cervical and lumbar spine.  See, e.g., AR at 786 (neurosurgical consultant's review of the MRI

20   records, impression, and plan); AR at 636 (MRI results).  These results and impressions do not

21   indicate the impact the newly diagnosed impairments had on Plaintiff's ability to work on a

22   function-by-function basis.[5]

23   _____

24   [4] The neurosurgical consultation does provide that Plaintiff had a limited cervical range of
     motion, upper extremity weakness, bilateral straight leg raises, and bilateral clonus, but the ALJ
25   did not explain how he utilized the information to arrive at the new RFC.  AR at 45.  The ALJ
     merely stated that the records showed that the 2017 opinions were not restrictive enough.  Id.
26   [5] For example, the neurosurgical consultation indicated the MRI evidence reflected central canal
27   stenosis at C6-7, degenerative disc disease at C5-6 and C6-7, and showed signs of cervical
     myelopathy and lumbar radiculopathy and opined that Plaintiff may need a spinal fusion,

28

20-cv-2517-BLM

As described above, the record establishes that the 2017 opinions were not persuasive, that Plaintiff's medical condition deteriorated after 2017, that her functional capabilities decreased after 2017, and that the post-2017 records consisted of raw medical data, without an opinion or analysis regarding her post-2017 functional capabilities.  As a result, there is not substantial evidence in the record to support the ALJ's RFC determination.  The ALJ erred by using his own interpretation and judgment of raw medical data to formulate Plaintiff's RFC.

D.  Duty to Develop the Record

Plaintiff argues that the ALJ had a duty to develop the record because there is an "evidentiary gap between the medical evidence and opinions of record."  ECF No. 17 at 11. Specifically, Plaintiff contends the ALJ had no opinion to base the RFC on and "should have reconciled the discrepancy."  Id.  Plaintiff offers ways in which the ALJ could have done so, including ordering an updated consultative examination, calling a medical expert to testify, or remanding the matter back to the state agency.  Id.  Although Defendant agrees that the ALJ has a general duty to develop the record, Defendant argues that Plaintiff "turns the burden of proving disability on its head[.]"  ECF No. 18 at 14.  Defendant cites to various Ninth Circuit opinions to establish the ALJ is qualified to "evaluate the opinion evidence and assess RFC."  Id. at 16-17.  Moreover, Defendant uses these cases to argue that the ALJ was under no duty or obligation to order a consultative examination or additional medical expert opinion.  Id. at 16.

Defendant cites to three unpublished Ninth Circuit opinions where the Court held the ALJ was not required to order additional consultative examinations for mental impairments.  Id. (citing Malloy v. Colvin, 664 F. App'x 638 (9th Cir. 2016), Leitner v. Comm'r of Soc. Sec., 361 Fed. App'x 876 (9th Cir. 2010), and Agadzhanyan v. Astrue, 357 F. App'x 148 (9th Cir. 2009)). These cases are distinguishable from the case at hand for several reasons, including the fact that Plaintiff's claims involve physical impairments, not mental ones.  In Malloy, the Court held the ALJ was under no duty to further develop the record where there were two psychological

_____

discectomy or laminectomy. AR at 786.  The consultation report does not explain how the impairments impact Plaintiff's capabilities.  Id.

evaluations that were performed after the last date Plaintiff was insured and the record lacked consistent evidence to support Plaintiff suffered from a mental impairment.  <u>Malloy</u>, 664 F. App'x at 640.  Similarly, in <u>Leitner</u>, there was no duty to further develop the record and order a consultative examination where there was a lack of objective evidence to support that Plaintiff's depression was severe.  <u>Leitner</u>, 361 F. App'x at 877.  Finally, in <u>Agadzhanyan</u>, the Court affirmed there was no duty to further develop the record and order additional psychological examinations because there was no evidence to support Plaintiff's condition had worsened.  <u>Agadzhanyan</u>, 357 F. App'x at 150 (affirming <u>Agadzhanyan v. Astrue</u>, No. CV 08-1161-CT, 2008 WL 11441912, at *7 (C.D. Cal. July 2, 2008)).  In contrast, the ALJ in this case found both that Plaintiff did suffer from severe physical impairments and that the impairments had worsened since the last medical opinion on Plaintiff's capabilities was issued.  The questions confronting the ALJ were the extent and scope of Plaintiff's decreased capabilities, exactly how the RFC should be further restricted given the specific nature of Plaintiff's decreased capabilities, and whether these determinations could be made based on the existing record.  Defendant's cases and argument do not address the issues confronting the ALJ and therefore are not persuasive.

It is well established that a Plaintiff bears the burden of proving disability by providing medical and other evidence that support the existence of an impairment.  <u>See</u> 20 C.F.R. § 404.152(a); <u>Stevenson</u>, 2015 WL 6502198, at *3 (citing <u>Bowen v. Yuckert</u>, 482 U.S. 137, 146 (1987) and <u>Tidwell v. Apfel</u>, 161 F.3d 599, 601 (9th Cir. 1998) ("At all times, the burden is on the claimant to establish her entitlement to disability insurance benefits.")).  Indeed, it is "not unreasonable to require the claimant, who is in a better position to provide information about [her] own medical condition, to do so."  <u>Yuckert</u>, 482 U.S. at 146 n.5.  Yet, the Ninth Circuit has held

> The ALJ in a social security case has an independent duty to fully and fairly develop the record and to assure that the claimant's interests are considered[.] Ambiguous evidence, or the ALJ's own finding that the record is inadequate to allow for proper evaluation of evidence, triggers the ALJ's duty to conduct the appropriate inquiry.

20-cv-2517-BLM

*Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001) (citations and internal quotations omitted).  Whether such ambiguity or inconsistency is present depends on the facts of each case. *Molina v. Berryhill*, No. 2:17-cv-01991 CKD, 2018 WL 6421287, at *3 (E.D. Cal. Dec. 6, 2018).  "There must be some objective evidence suggesting a condition that would have a material impact on the disability decision. *Id.* (citing *Smolen v. Chater*, 80 F.3d 1273, 1288 (9th Cir. 1996) and *Wainwright v. Sec'y of Health & Human Servs.*, 939 F.2d 680, 682 (9th Cir. 1991)).  Such objective evidence may include evidence that a condition has worsened.  *Compare Goodman v. Berryhill*, No. 2:17-cv-01228 CKD, 2019 WL 79016, *5 (E.D. Cal. Jan. 2, 2019) (finding a duty to develop where the ALJ accepted the state agency medical opinion over the plaintiff's treating physician's where the state agency's opinion was rendered prior to Plaintiff sustaining a fall and undergoing an MRI that showed her spinal compression had worsened) *with Smith v. Saul*, No. 1:19-cv-01085-SKO, 2020 WL 6305830, at * 8 (E.D. Cal. Oct. 28, 2020) (finding no duty to develop despite the presence of subsequent records post-dating the state agency's opinion where *inter alia* the records failed to "establish the existence of any new condition not assessed by the ALJ, or show a worsening of Plaintiff's existing conditions.").[6]  A duty to develop also may exist where the ALJ is interpreting raw medical data or records that are not "susceptible to a lay person's understanding."  *See Mack* 2020 WL 2731032, at *3 (remanded for further development of the record where the court found that the ALJ substituted his own judgment for that of a medical professional in considering MRIs and other radiology studies that no physician was asked to review); *Rivera v. Berryhill*, No. ED CV 16-791-SP, 2017 WL 5054656 (C.D. Cal. Oct. 31, 2017) (an ALJ "may not act as his own medical expert as he is

---

[6] The *Smith* court distinguished its decision from four other opinions from the Eastern District of California that found there was a duty to develop the record. *Smith*, 2020 WL 6305830, at *8 (citing *Molina*, 2020 WL 6421287, at *3 ("objective evidence suggested a condition that could have a material impact on disability decision), *Mack*, 2020 WL 2731032, at *2 (duty to develop where later records consisted of "raw medical data"), *Escudero*, 2019 WL 4917634, at *2 (finding the ALJ failed to develop the record where later records were not "self-evident" and "appear[ed] very medical in nature and not susceptible to a lay understanding."), and *Goodman*, 2019 WL 79016, at *5 (there was a duty to develop where there was subsequent medical evidence documented "significant medical events relevant to plaintiff's physical condition.")

20-cv-2517-BLM

'simply not qualified to interpret raw medical data in functional terms'") (quoting Nguyen, 172 F.3d at 35).

As discussed above, the ALJ determined that there was objective evidence establishing Plaintiff's medical condition worsened since the 2017 opinions regarding Plaintiff's functional capabilities and that those 2017 opinions were under restrictive.  Therefore, the issues facing the ALJ were the extent of Plaintiff's physical deterioration and the effect of Plaintiff's deterioration on her functional capabilities.  The record does not contain a medical opinion addressing these issues.  Instead, the relevant medical evidence consists of tests, diagnoses, and proposed treatment plans without an analysis of what the medical evidence means for Plaintiff's ability to work. See Stevenson, 2015 WL 6502198, at *4 (finding the ALJ's RFC determination impermissible where he reviewed medical findings lacking a function-by-function analysis and based the RFC on his own interpretation of raw medical evidence).  The test results are the type of raw medical data that is difficult for a lay person to interpret.  See AR at 636, 785-87; see also Mack, 2020 WL 2731032, at *2.  Because the record was inadequate to establish Plaintiff's current function-by-function capabilities, the ALJ had a duty to further develop the record.  His failure to do so was an error. See Escudero, 2019 WL 4917634, at *2 (finding a failure to develop the record where medical documents post-dating a physician's opinion included X-ray images and records that merely stated a diagnosis).

The record does contain one medical opinion that post-dates the February 2018 imaging studies and the January 2020 neurosurgical consultation.  In a letter dated January 21, 2020, Plaintiff's treating physician, Dr. Brodsky, identified several severe impairments for which he was treating Plaintiff and stated that the impairments limit her ability to walk or stand, negatively impact her body strength and dexterity, and leave her in constant pain.  AR at 788.  Dr. Brodsky concluded that Plaintiff was significantly physically incapacitated and could not participate in gainful employment.  Id.  The ALJ found this opinion to be unpersuasive and inconsistent with

treatment records.[7]  Id. at 45.  Because the ALJ rejected Dr. Brodsky's 2020 opinion and the record does not contain an opinion or interpretation of the functional limitations resulting from the 2018 through 2020 diagnoses, the ALJ's duty to further develop the record was triggered, warranting either a consultative examination or medical expert opinion by a physician who had access to Plaintiff's medical records through, at minimum, the January 2020 neurosurgical consultation.  See Banks v. Barnhart, 434 F. Supp. 2d 800, 805 (C.D. Cal. 2006) ("An ALJ cannot arbitrarily substitute his own judgment for competent medical opinion . . . and must not succumb to the temptation to play doctor and make . . . independent medical findings."); see also Tonapetyan, 242 F.3d at 1151 (9th Cir. 2002) (reversing and remanding for further proceedings where the ALJ's RFC determination was not based on a fully developed record

In light of the foregoing, the Court concludes that the ALJ erred by not further developing the record and that the ALJ's RFC determination is not supported by substantial evidence.

## REMAND VS. REVERSAL

The decision whether to remand for further proceedings or simply to award benefits is within the discretion of the court.  See Aida I. v. Saul, No. 3:19-CV-00476-AJB-RNB, 2020 WL 434319, at *5 (S.D. Cal. Jan. 28, 2020) (noting that "[t]he law is well established that the decision whether to remand for further proceedings or simply to award benefits is within the discretion of the Court.") (citing Salvador v. Sullivan, 917 F.2d 13, 15 (9th Cir. 1990); McAllister v. Sullivan, 888 F.2d 599, 603 (9th Cir. 1989); and Lewin v. Schweiker, 654 F.2d 631, 635 (9th Cir. 1981)).  Remand for further administrative proceedings is appropriate if enhancement of the record would be useful. See Gerde v. Berryhill, 717 F. App'x 674, 677 (9th Cir. 2017) ("[r]emand for further administrative proceedings to consider Dr. Alvord's opinion and the lay witness testimony is the proper remedy because enhancement of the record would be useful.") (citing Benecke v. Barnhart, 379 F.3d 587, 593 (9th Cir. 2004)).  On the other hand, if the record has been fully developed such that further administrative proceedings would serve no purpose,

---

[7] Plaintiff does not challenge the ALJ's decision to discount Dr. Brodsky's opinion.  See ECF No. 17.

"the district court should remand for an immediate award of benefits." Benecke, 379 F.3d at 593. "More specifically, the district court should credit evidence that was rejected during the administrative process and remand for an immediate award of benefits if (1) the ALJ failed to provide legally sufficient reasons for rejecting the evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited." Id. (citing Harman v. Apfel, 211 F.3d 1172, 1178 (9th Cir. 2000)). The Ninth Circuit has not definitively stated whether the "credit-as-true" rule is mandatory or discretionary. See Vasquez v. Astrue, 572 F.3d 586, 593 (9th Cir. 2009) (acknowledging that there is a split of authority in the Circuit, but declining to resolve the conflict); Luna v. Astrue, 623 F.3d 1032, 1035 (9th Cir. 2010) (finding rule is not mandatory where "there are 'outstanding issues that must be resolved before a proper disability determination can be made'" (internal citation omitted)); Shilts v. Astrue, 400 F. App'x 183, 184-85 (9th Cir. Oct. 18, 2010) (explaining that "evidence should be credited as true and an action remanded for an immediate award of benefits only if [the Benecke requirements are satisfied]" (internal citation omitted)). "Even if all three requirements are met, the Court retains flexibility to remand for further proceedings 'when the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled within the meaning of the Social Security Act.'" Nichols v. Saul, No. 19CV490-BEN-LL, 2019 WL 6252934, at *10 (S.D. Cal., Nov. 22, 2019) (quoting Brown-Hunter v. Colvin, 806 F.3d 487, 495 (9th Cir. 2015)). A remand for an immediate award of benefits is appropriate only in rare circumstances. Nichols, 2019 WL 6252934, at *10.

Here, based on the record before it, the Court concludes that the rare circumstances that may result in a direct award of benefits are not present. See Leon v. Berryhill, 880 F.3d 1041, 1044 (9th Cir. 2017) ("[a]n automatic award of benefits in a disability benefits case is a rare and prophylactic exception to the well-established ordinary remand rule"); see also Howland v. Saul, 804 F. App'x 467, 471 (9th Cir. 2020) (same). Instead, the Court finds further administrative proceedings will serve a meaningful purpose by allowing the ALJ to develop the record with regard to Plaintiff's physical function-by-function capabilities in light of the medical evidence

obtained in 2018 through 2020.

## CONCLUSION

Therefore, the Court **REVERSES** the ALJ's decision and **REMANDS** for further proceedings to address the errors noted in this Order.

**IT IS SO ORDERED**.

Dated: 7/14/2022

Hon. Barbara L. Major
United States Magistrate Judge

20-cv-2517-BLM